J-S41011-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: ADOPTION OF: L.H.B., A MINOR | : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: A.A., MOTHER | : : : : : : : | |
| | : | No. 1069 MDA 2022 |

Appeal from the Decree Entered June 30, 2022
In the Court of Common Pleas of Lancaster County Orphans' Court at
No(s):  2021-1153

BEFORE:   LAZARUS, J., MURRAY, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY LAZARUS, J.:               **FILED:  FEBRUARY 1, 2023**

A.A. (Mother) appeals from the decree, entered in the Court of Common Pleas of Lancaster County Orphans' Court Division, involuntarily terminating her parental rights to her minor son, L.H.B. (born October 2011).  After careful review, we affirm.

In 2012, Child's natural father, H.G.B. (Father), filed a complaint against Mother seeking custody of Child.[1]  On September 14, 2013, the court entered an order granting Father primary custody and Mother partial physical custody and giving the parties shared legal custody of Child.  Father filed a petition for modification of the custody order in February 2015; following a hearing, the court ordered that the parties share legal custody and that Father have

_____

[*] Former Justice specially assigned to the Superior Court.

[1] Mother and Father were never married.

primary physical custody and Mother be given supervised visitation. The court also ordered Mother to petition the court to schedule a supplemental risk-of-harm hearing regarding her then-live-in boyfriend, T.B.[2]

Following custody and risk-of-harm hearings held in June 2015, the court entered an order stating that it was "unable to determine whether [T.B.] poses a current risk of harm to [Child] or is need of further counseling." Order, 10/19/15, at 1. The court noted that Mother, who was present at the hearings, failed " to procure the necessary testimony from any counselors who provided treatment to [T.B.]." *Id.* As a result, the court found that "[p]ending a determination as to whether [T.B.] poses a risk of harm to [C]hild, the parties shall share legal custody of [C]hild; Father shall be granted primary physical custody of [C]hild; and Mother shall be granted periods of supervised visitation with [C]hild[.]" *Id.* at 2.[3]

On October 10, 2017, Mother filed a petition to modify the custody order alleging "[t]here is an immediate danger to [C]hild due to the neglect of [F]ather [as a result of which] Child is at serious risk of developing infection

---

[2] In January 2015 and March 2020, the court entered protection from abuse (PFA) orders against T.B., who is also the father of Mother's other two minor children, T.M.B. and M.K.B. The PFAs prohibited boyfriend from possessing firearms and from "abusing, harassing, or attempting to threaten to use physical force against [Mother]." PFA Order, 2/11/20.

[3] Mother alleged that T.B. screamed at her, was acting erratically in front of her and their children, locked her in the basement, and, at one point, "threw [her] into a wall for returning home late from work." Incident of Abuse Sheet, 1/17/15, at 1. Mother also alleged that T.B. "had been using crystal meth for . . . days." *Id.* at 2.

due to the number of [flea] bites[, as] Child is being forced to sleep in a bed infested with fleas[.]" Petition to Modify Custody, 10/10/17, at 1.

On April 20, 2021, Mother filed a *pro se* petition to modify the parties' custody order, seeking sole physical custody of Child, after being notified by the Lancaster County Children and Youth Agency that Father had been criminally charged with endangering the welfare of a child, simple assault, and harassment. The charges stemmed from an incident that occurred between Father and Child after Father found out Child, who was unsupervised, had shot Father's .22 while Father was at work. **See** N.T. Termination Hearing, 5/20/22, at 15 (Father testifying, "[Child] admits that he shot the [.]22, and I didn't know about that until then. And I started yelling and screaming and so forth, and I ended up spanking him with my hand at that point over it."); *id.* at 17 ("And at that point my frustration was already sky high and I ended up losing it on him again. . . . I grabbed [the clay bird thrower] and started spanking him on the butt [and] . . . I did hit him [o]n the legs and it looked like the thighs . . . a few times."). Father was placed on Accelerated Rehabilitative Disposition (ARD), and agreed to complete anger management courses, pay a fine, and perform 40 hours of community service.

On May 6, 2021, L.Z., paternal grandmother (Grandmother), filed a "Petition for Special Relief" seeking suspension of the parties' custody action and cancellation of a pending custody conference. In her petition,

Grandmother sought the adoption of Child,[4] involuntary termination of Mother's parental rights, and confirmation of consent to terminate parental rights by Father.[5] On May 26, 2021, the court held a custody conference via video, after which no agreement was reached between the parties; *status quo* remined with regard to custody. On June 9, 2021, Grandmother filed a petition to intervene in the parties' custody matter. The court denied the intervention petition on June 23, 2021, and ordered a hearing to address Grandmother's standing, any risk-of-harm issues with regard to Child, and custody.

On July 14, 2021, the court entered a preliminary decree scheduling hearings on Grandmother's termination and consent petitions. On July 26, 2021, the court entered an order approving several recommendations made by a custody conference officer that included scheduling a November 10, 2021 hearing to address Father's "criminal history issues, standing issues[,[6]] and

---

[4] Pursuant to 23 Pa.C.S.A. § 2531(c), a report of an intention to adopt is not required when the "child is the . . . grandchild . . . of the person receiving or retaining custody or physical care." **See infra** at n.6.

[5] Father voluntarily consented to termination of his parental rights to Child. **See** Consent to Termination of Parental Rights, 5/5/21. He is not a party to this appeal.

[6] Although not raised on appeal, we question whether Grandmother had standing to file the termination petition under 23 Pa.C.S.A. § 2512. **See id.** at § 2512(a)(3) ("The individual having custody or standing *in loco parentis* to the child and who had filed a report of intention to adopt required by section 3531 (relating to report of intention to adopt) . . . may file a petition to terminate parental rights with respect to a minor child."). It does not appear
*(Footnote Continued Next Page)*

- 4 -

general custody issues." Order, 7/26/21. However, due to the pending petition for adoption, the court cancelled the custody hearing. Instead, the court held two days of hearings on the termination petition in December 2021 and May 2022.

Patricia L. Dunlevy-Williams, Esquire, was appointed as Child's guardian *ad litem* and legal counsel for the contested termination of parental rights hearings.[7] Mother, Father, and Grandmother testified at the hearings. On June 29, 2022, the court issued a decree terminating Mother's parental rights

_____

that any court has made a determination that Grandmother stands *in loco parentis*, although Grandmother does aver in her petition that she "has assumed the maternal role in [Child's] life." Petition for Adoption, Involuntary Termination, and Confirmation to Consent to Termination, 5/6/21, at ¶ 19. **See** N.T. Termination Hearing, 5/20/22, at 111-12 (Grandmother testifying no court has ordered that Grandmother have any form of legal custody of Child). However, we conclude that Mother has waived the issue of standing by not objecting to the petition on that basis and by participating in the termination hearings. **See In re Paulmier**, 937 A.2d 364, 368 n.1 (Pa. 2007) (unlike subject matter jurisdiction, issue concerning standing is subject to waiver). **See also In re Adoption of Z.S.H.G.**, 34 A.3d 1283 (Pa. Super. 2011) (rejecting notion standing is intertwined with court's subject matter jurisdiction for purposes of termination proceeding).

[7] Attorney Dunlevy-Williams informed the court that Child's legal and best interests were aligned and not in conflict with one another. **See** 23 Pa.C.S.A. § 2313(a) (children have statutory right to counsel in contested involuntary termination proceedings); **In Re: T.S., E.S.**, 192 A.3d 1080, 1092 (Pa. 2018) ("[D]uring contested termination-of-parental-rights proceedings, where there is no conflict between a child's legal and best interests, an attorney-guardian *ad litem* representing the child's best interests can also represent the child's legal interests.").

to Child pursuant to subsection 2511(a)(1)[8] and (b)[9] of the Adoption Act.[10] The court concluded that terminating Mother's parental rights would give Child "the consistency he has been deprived of . . . and will best serve [Child's] developmental, physical, and emotional needs and welfare [as] Child is in need of a nurturing, loving and stable home environment [that] Mother is unable to provide and has failed to provide, and the severance of a non-existent bond between [] Child and Mother will have no impact upon Child." Trial Court Opinion, 8/24/22, at 12-13.

Mother filed a timely notice of appeal and court-ordered Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal. Mother raises the following issues for our consideration:

> (1) Whether the [c]ourt erred in terminating Mother's parental rights to [C]hild because [DHS] failed to prove by clear and convincing evidence that Mother's parental rights should be terminated under 23 Pa.C.S.A. [§] 2511(a)(1).

---

[8] **See** 23 Pa.C.S.A. § 2511(a)(1) (rights of parent to child may be terminated after petition filed alleging "[t]he parent by conduct continuing **for a period of at least six months immediately preceding the filing of the petition** either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties").

[9] **See id.** at § 2511(b) (in terminating parental rights, court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child" and . . . . [w]ith respect to any petition filed pursuant to subsection (a)(1)[,] the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition").

[10] 23 Pa.C.S.A. §§ 2101-2938.

(2)     Whether the [c]ourt erred in terminating Mother's parental rights to [C]hild because [DHS] failed to prove by clear and convincing evidence under 23 Pa.C.S.A. [§] 2511(b) that it is in the [C]hild's best interest for Mother's parental rights to be terminated.

Appellant's Brief, at 7.

> In an appeal from an order terminating parental rights[,] our scope of review is broad and comprehensive, but our standard is narrow. We consider all the evidence, along with the legal and factual findings of the trial court. *In re M.G.*, [] 855 A.2d 68, 73 (Pa. Super. 2004).  However, we reverse only if we find an abuse of discretion, an error of law, or insufficient evidentiary support. *In re C.S.*, [] 761 A.2d 1197, 1199 (Pa. Super. 2000) (en banc). With respect to evidentiary support, we determine only whether the trial court's findings are supported by competent evidence. *In re S.H.*, [] 879 A.2d 802 [Pa. Super. 2005].  We accord the hearing judge's decision the same deference that we would give to a jury verdict.  [*In re*] *C.S.*, 761 A.2d at 1199.

*In re C.M.S.*, 884 A.2d 1284, 1286 (Pa. Super. 2005).  In matters arising under the Adoption Act "our plenary scope of review is 'of the broadest type;' that is, an appellate court is not bound by the trial court's inferences drawn from its findings of fact, and is compelled to perform a comprehensive review of the record for assurance the findings and credibility determinations are competently supported." *T.B. v. L.R.M.*, 786 A.2d 913, 916 (Pa. 2001).

In *In re Adoption of C.M.*, 255 A.3d 343 (Pa. 2021),[11] our Supreme Court recently addressed whether there was sufficient evidence to support

---

[11] We find it surprising that neither Mother nor Appellees (Lancaster County Children and Youth Services/Paternal Grandmother and Guardian *Ad Litem*) cite *C.M.* in their appellate briefs—a decision directly on point with the instant matter.  *C.M.*, which was decided on July 21, 2021, was filed more than one year before Mother's brief and Appellees' briefs were filed.  The trial court also fails to reference or cite to this decision in its Rule 1925(a) opinion, which was also filed more than one year after *C.M.*

involuntarily terminating a father's parental rights under subsection 2511(a)(1), where petitioners were mother and maternal grandparents and mother had voluntarily relinquished her own parental rights. In reaching its conclusion that termination was improper, the Court stated the following regarding the six-month time period referenced in subsection 2511(a)(1):

> [T]hough orphans' courts assessing evidence under [s]ubsection 2511(a)(1) should not apply the relevant six-month period mechanically — but with an eye to the child's best interests, *see* [*In re*]*T.S.M.*, 71 A.3d [251,] 268-69 [(Pa. 2013)], while acknowledging the purpose of the provision is not to punish an ineffective parent, *see B.E.*, 377 A.2d at 154 — **we reinforce the view that the six-month period immediately preceding the filing of the petition is the most critical period to evaluate for affirmative conduct or its absence, and courts must address it**. *See* [*In re Adoption of*]*C.J.A.*, 204 A.3d [496,] 504-05 [(Pa. Super. 2019)] ("Because the Adoption Act require[s] the court to focus its attention on the six months immediately preceding the filing of the petition, and because the record supports the court's decision that Father made substantial efforts to perform his parental duties during that time, [p]etitioners are not entitled to relief.").

*Id.* at 367 (emphasis added).

Keeping in mind that the six months immediately preceding the filing of Grandmother's termination petition was the "critical period" for purposes of evaluating Mother's conduct under subsection 2511(a)(1), the following list enumerates the actions[12] Mother took in the instant case from December 2020-May 2021:

---

[12] While we are aware that termination and custody are separate matters and involve different proceedings, in this case where parents retain custody of Child and a termination petition has been filed by a non-agency, a parent's

*(Footnote Continued Next Page)*

- Mother consistently paid child support (2019-2021)[13]
- Mother testified she called Father in December 2020 regarding Child
- Mother filed a petition to modify custody (4/20/21)
- Mother participated in a custody conference (4/25/21)

*See id.* at 367 ("It is crystal clear . . . that a parent's legal efforts to enforce custodial rights demonstrate an affirmative performance of a positive parental duty.").

In addition to taking into account the above-noted parental actions, we "must [also] examine the individual circumstances and any explanation offered by the parent to determine if that evidence, **in light of the totality of the circumstances**, clearly warrants permitting the involuntary termination [of parental rights]." *C.M.*, 255 A.3d at 364 (emphasis added). More specifically, in "further consideration of the totality of circumstances, if competent evidence established statutory criteria under [s]ubsection 2511(a)(1), we then require three lines of inquiry: (1) the parent's explanation for [] her absence; (2) the post-abandonment contact between [P]arent and [C]hild; and (3) consideration of the effect of termination of parental rights on [C]hild pursuant to [s]ubsection 2511(b). *Id.* at 365. The focus of subsection 2511(a)(1) is "whether, under the circumstances, the

_____

conduct with regard to custody is relevant in the termination proceeding. *See C.M.*, *supra*.

[13] Mother paid child support from 2019 to 2021, despite the fact that she left her hospital job in September of 2020 due to COVID-related concerns. N.T. Termination Hearing, 12/10/21, at 75 (Mother testifying she "consistently" paid support for Child for "entire two-year period").

parent has utilized all available resources to preserve the parent-child relationship." *Id.*

Instantly, the trial court found that in the six years since Father initiated the underlying custody action against Mother, Mother did not follow the trial court's direction to schedule a hearing where she could present evidence about whether T.B. posed a risk of harm to Child in an effort to support her regaining unsupervised physical custody of Child. *See* Trial Court Opinion, 8/24/22, at ¶ 20-21. The court also concluded that: post-separation, Father had done nothing that would have prevented Mother from contacting Child; between December 2018 and January 2019, Father sent Mother text messages about arranging times to see Child; Father attempted to contact Mother, after January 2019, to determine if Mother was going to come to see Child; Mother had no contact with Father or Child after February 2019; Mother did not inform Father of any address changes; Mother knows where Grandmother works and lives, as well as Grandmother's phone number; Grandmother oversees Child's daily activities, prepares his meals, and "has been the mother figure for [C]hild;" Mother never attended any of Child's school-related events; after February 2019, Mother did not send Child any birthday or holiday cards; Mother was present for only one of Child's three surgeries in 2018; Mother never attended Child's routine medical and dental appointments; termination of parental rights will give Child direly needed consistency; Child's guardian *ad litem* believes Mother could have overcome any obstacles placed against her; and, severance of a non-existent bond between Child and Mother will

have no impact upon Child. Trial Court Opinion, 8/24/22, at 8-13. **See also id.** at 16 (court stating, "The record reflects clear and convincing evidence that Mother chose a self-imposed estrangement from [] Child for a period far exceeding the six months preceding notice to her of the petition to terminate her parental rights.").

Instantly, Mother admitted at the termination hearings that she has not seen Child or attempted to see Child since January 2019. N.T. Termination Hearing, 5/20/22, at 147 (Mother testifying "I haven't seen him since [January of 2019] because I failed him."); **id.** at 152 ("I made a mistake and I've failed."). Although Mother has had either partial physical custody of Child or the right to supervised visits with Child since 2013, she has not exercised those custodial rights for years. Not until Mother was informed that charges had been filed against Father for allegedly assaulting Child, did Mother file a petition to modify custody. **Id.** at 148 (Mother testifying, "I should, and I mean then and now, [have] put aside the distrust that I have of [Grandmother] to do whatever need[ed] to be done for [Child]."). While Mother claims that she tried to call Father between 2019 and 2020, she failed to offer any evidence to support this assertion and the trial court did not find this testimony credible. **See** Trial Court Opinion, 8/24/22, at 18.

Moreover, the trial court concluded that despite Mother's claim that Father and Grandmother prevented Mother from contacting Child, Mother had the ability to contact them. **See** N.T. Termination Hearing, 5/20/22, at 156 (Child's guardian *ad litem* testifying while "there were some obstacles put in

Mo[ther]'s place, [] I don't think that she made—that she couldn't overcome them."). In fact, Father entered into evidence text messages he sent to Mother to arrange visits between her and Child. *See In re B., N.M*, 856 A.2d 847, 855 (Pa. Super. 2004) ("Parental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with [the child's] physical and emotional needs."); *id* ("A parent must utilize all available resources to preserve the parental relationship, and must exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent-child relationship.").

"Although a parent is not required to perform the impossible, [s]he must act affirmatively to maintain h[er] relationship with h[er] child, even in difficult circumstances. A parent has the duty to exert h[er]self, to take and maintain a place of importance in the child's life." *Id.* at 855-56. Here, Mother has done exactly the opposite for more than two years. Her last-ditch efforts to modify custody were in response to Father being charged with assaulting Child. While that is, no doubt, a very serious concern for a parent, Mother essentially abandoned Child for over two years; her absence was neither reasonably explained nor the result of circumstances beyond her control. *See In re Burns*, 379 A.2d 535, 540 (Pa. 1977).

Unlike the facts in *C.M.*, *supra*, the instant record reveals that Father did not rebuff Mother's requests to see Child and did not refuse to take Mother's calls. In fact, the opposite is true. Mother admitted that she "should have done more [and] just felt that [she] wasn't good enough." N.T.

Termination Hearing, 12/10/21, at 64. *Cf. In re Adoption of L.A.K.*, 265 A.3d 580 (Pa. 2021) (termination of father's parental rights reversed where father's efforts to obtain sobriety defeated claim of parental abandonment; alcohol presents barrier to fulfilling parental obligations under subsection 2511(a)(1)). Here, Mother "thought [that] if [she] could just make enough money, [she] could do what [she] needed to do . . . to get [Child] back." N.T. Termination Hearing, 12/10/21, at 65. Father testified that he reached out to Mother to visit with Child to no avail, producing text messages to corroborate his testimony. Also, unlike *C.M.*, the trial court *did* consider the six-month period immediately preceding the filing of Grandmother's termination petition and concluded that that any apparent obstacles Mother felt Grandmother or Father had erected to prevent her from seeing Child were, in fact, either non-existent or surmountable. *Cf. C.M.*, *supra*. Based upon a totality of the circumstances, we agree that termination was proper under subsection 2511(a)(1).

With regard to Mother's claim that the court improperly terminated her parental rights under subsection 2511(b), we also find it warrants no relief. Mother contends that Child, who was 10 years old at the time of the termination hearings, should have been "present at the hearings so that he could be interviewed by the [j]udge and counsel" to determine if termination would best serve Child's needs and welfare. Appellant's Brief, at 19. In addition, Mother argues that because no bonding assessment was performed and Child's guardian *ad litem* did not observe Mother and Child together, "in

- 13 -

the absence of expert testimony, Mother disagrees with the [c]ourt's conclusion that 'Mother's re-introduction to [C]hild after the lengthy, self-imposed absence would be disruptive and damaging to [C]hild's psychological and emotional well-being.'" *Id.* at 20-21.

Subsection 2511(b) neither explicitly requires a bonding analysis nor requires a court to order a formal bonding evaluation by an expert to resolve a bond analysis. *In re K.K.R.-S.*, 958 A.2d 529, 533 (Pa. Super. 2008) (citation omitted). The extent of any bonding analysis under subsection 2511(b) depends upon the particular circumstances of a case. *In re Adoption of J.M.*, 991 A.2d 321, 324 (Pa. Super. 2010). Finally, when the record is devoid of any bond between a parent and child, it is reasonable to infer that none exists. *In re K.Z.S.*, 946 A.2d 753, 764 (Pa. 2008).

Here, the record supports the trial court's determination that termination of Mother's parental rights is in Child's best interest. Instantly, Child's guardian *ad litem* testified that she had met with Child several times—the final meeting just a few months before the termination hearings—and that Child "was very adamant that he wants to stay with [G]randmother[,] . . . that he's not afraid to be with [F]ather[, and that] he doesn't want to [be with Mother]." N.T. Termination Hearing, 5/20/22, at 157. Guardian *ad litem* also testified that there is a demonstrated strong bond between Grandmother and Child, that Child looks to Grandmother "to meet his needs," and that Child's "expectations are [that] in the future" Grandmother will continue to meet his needs. *Id.* Finally, Child's guardian *ad litem* unequivocally testified that

- 14 -

terminating Mother's parental rights would be in Child's best interest where Grandmother meets Child's needs and is an adoptive resource. *See In re B.L.L.*, 787 A.2d 1007, 1011 (Pa. Super. 2001) (where child's guardian *ad litem* presented own expert evidence regarding child's needs and welfare, record "unequivocally established that the child's needs and welfare are best served by termination of mother's parental rights"); *see also* Pa.R.J.C.P. 1154(9) (guardian *ad litem* has a duty to[] "[a]dvise the court of the child's wishes to the extent that they can be ascertained and present to the court whatever evidence exists to support the child's wishes [and] . . . determine to the fullest extent possible the wishes of the child and communicate this information to the court"); 42 Pa.C.S.A. 6311(b)(9) (same).

With regard to Mother's claim that the court improperly failed to interview Child in order to assess his needs and welfare under subsection 2511(b), we look to *In re B.L.L.*, *supra* for guidance. In *B.L.L.*, our Court addressed a parent's similar claim that a trial court erred in refusing to allow appellant's child to testify at the termination hearing. Noting that termination proceedings predominantly focus on the parent's conduct, our Court opined:

> The needs and welfare of the child are a discrete consideration to be determined only after the statutory requirements for termination have been met. As such, the preference of the child, reviewable in a custody proceeding, and his right to be heard on the record, is not relevant to termination proceedings, as the child is not electing a choice between two otherwise fit parents with whom he will be able to be placed. It is only when termination has been decreed and adoption pursued is the child's expression relevant to placement.

*Id.* at 1014. The Court reiterated that because, in a termination matter, a court appoints counsel for parents unable to pay for legal representation and provides counsel for a child to advance his or her interests, "the fulfillment of the explicit statutory requirements for involuntary termination are assured adequate review and the resultant evaluation of the needs and welfare of the child are fully considered." *Id.* Ultimately, our Court upheld the decree terminating the parent's rights in *B.L.L.*, concluding that "there is no statutory requirement nor is there any Pennsylvania appellate decision [that] permits or requires the testimony or preference by the child to be placed on the record as an integral part of a termination proceeding." *Id.*

Likewise, we conclude that the trial court did not abuse its discretion by not having Child testify where neither statute nor case law mandate such in a termination proceeding and we are confident that Child's needs and welfare have been fully evaluated and considered. *B.L.L.*, *supra*.

Decree affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 02/01/2023